## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**CLYDE J. STREIGHT,**

   **Plaintiff,**

**v.**
                                              **Civil Action No. 1:05CV149**
                                              **(The Honorable Irene M. Keeley)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

   **Defendant.**

## <u>REPORT AND RECOMMENDATION/OPINION</u>

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

## <u>I. Procedural History</u>

Clyde J. Streight ("Plaintiff") filed DIB and SSI applications on August 6, 2002, alleging disability since October 8, 1997, due to lumbar and cervical fusion due to an accident (R. 141-143, 172, 696-98). Plaintiff's applications were denied initially and upon reconsideration (R. 116-20, 121-24, 699-708). Plaintiff filed a request for hearing by an administrative law judge ("ALJ") (R. 131-33). On February 25, 2004, a hearing was held before ALJ Donald T. McDougall, at which Plaintiff, who was represented by counsel, and Timothy Mahler, a vocational expert ("VE"), testified

(R. 63-115). On September 13, 2004, the ALJ issued a decision and found Plaintiff was not disabled (R. 16-54). On September 16, 2005, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 7-15).

## II. Statement of Facts

Plaintiff, who was born on August 13, 1961, was forty-three years of age on the date of the ALJ's decision. He completed the ninth grade in school and then obtained a GED (R. 19, 68-69). Plaintiff's past work experience was that of a truck driver, concrete worker, and heavy equipment operator (R. 89-94, 106-07, 173). Plaintiff was also enlisted in the National Guard from October 6, 1979, through April, 1994 (R. 69).

On September 16, 1997, Plaintiff was treated at a hospital's emergency department for injuries he sustained in a motor vehicle accident on September 15, 1997 (R. 223). He experienced back pain and was diagnosed with lumbar/cervical spasm. He was stable and treated with Flexeril and Darvocet (R. 223-24). Plaintiff was released with instructions to take his medications and use heat on his back (R. 225).

On October 10, 1997, Plaintiff was examined by Richard Irvin, D.O. Dr. Irvin noted it was Plaintiff's fist visit to his office and Plaintiff offered no medical history except he had been injured in a motor vehicle accident three weeks earlier and experienced severe neck and back pain and headaches. Dr. Irvin's examination revealed "diffuse severe musculoskeletal tenderness to palpation and paravertebral muscular spasm" of Plaintiff's back. Dr. Irvin diagnosed severe lumbar strain and recommended Plaintiff remain off work for two weeks, treat back with rest and moist heat, and attend physical therapy. Dr. Irvin prescribed Flexeril and Percocet to Plaintiff (R. 425).

On October 24, 1997, Plaintiff returned to Dr. Irvin and informed him that he had been

2

"feeling a little better" and had been involved in physical therapy for two weeks. Dr. Irvin observed lumbar pain upon palpation and decreased range of motion. Dr. Irvin refilled Plaintiff's prescriptions for Percocet (R. 424).

On November 7, 1997, Dr. Irvin examined Plaintiff and determined his physical exam was unchanged. Plaintiff complained of low back pain and "alot [sic] of spasm to the musculature." Plaintiff was continuing with physical therapy and his medications. Dr. Irvin refilled Plaintiff's prescriptions for Percocet and Flexeril (R. 424).

On November 15, 1997, a MRI of Plaintiff's lumbar spine revealed mild to moderate central discal herniation at L5-S1 (R. 357).

On December 27, 1997, a MRI of Plaintiff's cervical spine revealed degenerative spondylotic changes from C4-C7, discal herniation C5-6 toward right, disc degeneration at C5-6, and hypertrophic changes at C6-7 joint on the right (R. 355-56).

On January 12, 1998, through May 15, 1998, Plaintiff was treated at Ohio Valley Medical Center's Physical Therapy Department for headaches (R. 238-59). On April 24, 1998, Plaintiff reported to the physical therapist that he was experiencing bilateral TMJ (R. 247). Plaintiff was discharged from physical therapy services on May 15, 1998, and it was noted he had experienced "good recovery" from TMJ but still experienced headaches (R. 238).

On January 21, 1998, Dr. B. R. Geddam corresponded with Dr. Alba about the results of Dr. Geddam's examination of Plaintiff. He wrote Plaintiff's HEENT examination was within normal limits (R. 230). Plaintiff's lungs were clear and abdomen was normal. Dr. Geddam observed paraspinal spasms of Plaintiff's cervical and lumbar spine, his movement was restricted, his straight leg raising test was positive bilaterally, his deep tendon reflexes were normal, and he had no sensory

3

deficit in upper or lower extremities. Dr. Geddam reviewed Plaintiff's November and December MRI's. His impression was for lumbar and cervical radiculopathic pain, and he recommended epidural injections (R. 231).

On March 4, 1998, a x-ray of Plaintiff's cervical spine revealed "old fusion of the cervical spine without apparent complications" (R. 354).

On May 8, 1998, Sam Vukeich, M.D., provided a medical report of Plaintiff to the Worker's Compensation Division. Plaintiff complained of "numbness and throbbing constantly in [his] fingers on both side, except for [his] 5th finger"; intermittent feeling of "needles" in his arms; and pain in low back and both legs when he rose after sitting "for awhile" (R. 275). Plaintiff reported he had received four epidural injections. The three injections to his back "helped," but the injection to his neck made his pain worse (R. 276). Dr. Vukeich's orthopaedic examination of Plaintiff revealed cervical range of motion was fifty-five degrees to the right and thirty-five degrees to the left. Flexion was forty degrees and extension was twenty degrees (R. 277). Plaintiff's right and left lateral bending was thirty-five degrees (R. 277-78). Plaintiff experienced tenderness upon Dr. Vukeich's examination of his paraspinous muscles and posterior spinous processes, but they were without spasm. Dr. Vukeich opined Plaintiff's biceps and triceps reflexes were equal bilaterally and he had good muscle tone. Plaintiff had no hand atrophy, but did have decreased sensation in his right fingers (R. 278). Dr. Vukeich reviewed Plaintiff's November 15, 1997, and March 4, 1998, x-rays and Plaintiff's November 15, 1997, and December 27, 1997 MRI's (R. 278-79).

Dr. Vukeich opined Plaintiff had met the maximum degree of medical improvement. He noted Plaintiff's x-rays and MRI's showed "some mild arthritic changes but nothing that [he] could point to and state that he has a problem that is recoverable, doing a surgical procedure." Dr. Vukeich

opined Plaintiff's low-back impairment had responded to treatment and would "completely subside." Dr. Vukeich opined he did "not see why [Plaintiff] would not be able to work" (R. 280). Dr. Vukeich found Plaintiff's whole person impairment was ten percent and was based on the range of motion model (R. 280).

On May 12, 1998, Plaintiff was examined by Dr. Irvin, who noted his exam was unchanged. He diagnosed cervical disc disease and encouraged Plaintiff to seek a second neurologic surgical opinion (R. 413).

On June 11, 1998, Fred J. Payne, M.D., corresponded with Dr. Irvin, who had referred Plaintiff to Dr. Payne. Dr. Payne recommended Plaintiff undergo a cervical myelogram, a cervical CT scan, a cervical spine x-ray, and an EMG nerve conduction study of his upper limbs (R. 261).

On June 15, 1998, Dr. Irvin examined Plaintiff for his back and neck injury. Plaintiff was not taking any pain medications at that time but was treating his condition with heat. Dr. Irving recommended Plaintiff take Aleve and prescribed Valium (R. 411).

On June 30, 1998, Plaintiff complained of severe cervical and lumbar back pain to Dr. Irvin. Dr. Irvin noted Plaintiff had decreased tendon reflex in the upper extremities and weakened triceps and biceps strength. Dr. Irvin assessed cervical disc disease and possible lumbar disc disease (R. 410).

On July 17, 1998, Plaintiff was examined by Dr. Irvin, who noted his neurologic examination was unchanged. He diagnosed cervical and lumbar disc disease (R. 409).

On July 22, 1998, Plaintiff underwent an EMG, which showed "normal nerve conduction velocities and needle studies of upper extremities" and "no evidence for radiculopathy and neuropathy" was detected (R. 264).

On August 11, 1998, Plaintiff underwent a cervical CT scan. It showed "central C4-5 disc herniation causing mild to moderate central stenosis" and superimposed end plate spurring; status post C5-6 fusion with "abnormal soft tissue anterior and to the right of the thecal sack at the level where there is also some end plate spurring"; and right paracentral C6-7 disc herniation (R. 262).

On August 11, 1998, Plaintiff underwent a cervical myelogram, which showed "central C4-5 and C6-7 compression" (R. 263).

On August 31, 1998, Plaintiff presented to Dr. Irvin for follow-up for his cervical disc disease. Dr. Irvin noted Plaintiff's physical examination remained unchanged (R. 408).

On November 5, 1998, Plaintiff reported to Dr. Irvin that he continued to experience "a lot of cervical pain in his arms." Dr. Irvin diagnosed cervical disc disease (R. 406).

On November 16, 1998, Stephen M. Bloomfield, M.D., evaluated Plaintiff and informed Dr. Payne of his findings in a November 19, 1998 letter. In making his evaluation, Dr. Bloomfield examined Plaintiff and reviewed "multiple MRI scans and myelogram with follow-up CT scan." Dr. Bloomfield opined Plaintiff had "a complex degenerative spine disorder with continued compression of nerve roots on the right side at the C5-6 level and possibly the C6-7 level." Dr. Bloomfield found the C5-6 fusion "appear[ed] to be intact." Dr. Bloomfield also found that, "[d]espite the EMG nerve conduction study, dated 7/22/98, being normal, [he believed] that [Plaintiff] [had] nerve root irritations on the right side at the C5-6 level." Dr. Bloomfield observed "significant" C4-5 disease was not present clinically or on the myelogram or CT scan. Dr. Bloomfield found Plaintiff had "mild spinal stenosis" (R 299). Dr. Bloomfield opined Plaintiff's spinal degenerative disorder could be treated with a posterior cervical or anterior spinal decompression, but noted he would not choose which treatment was appropriate "do to [his] relative lack of experience in this area." Dr. Bloomfield referred Plaintiff to Dr. John France for a second opinion and to Dr. Howard Kaufman

for a surgical consultation. He recommended Plaintiff continue with physical therapy, with traction, and to wear a soft collar and that he undergo a flexion extension study (R. 300).

On December 1, 1998, Plaintiff reported to Dr. Irvin that he was being treated by Dr. Bloomsfield for his neck condition and intended to return to Dr. Payne for treatment. Dr. Irvin refilled Plaintiff's prescription for Percocet (R. 404).

On December 17, 1998, Plaintiff was examined by John C. France, M.D., Chief of Spinal Surgery at West Virginia University Department of Orthopedics. Dr. France observed Plaintiff was not in "acute distress" during the examination. His range of motion of his neck was limited and his back was tender to palpation. Dr. France observed "ratcheting weakness in his upper and lower extremities" and altered sensation in Plaintiff's left leg. Dr. France found Plaintiff was positive for Hoffman's signs, bilaterally, and was "a little hyperreflexic in his upper and lower extremities." Plaintiff's gait was antalgic and his mobility was "poor" in his back and neck. Dr. France noted Plaintiff did not have clonus at the ankles and his Babinski's were normal. Dr. France opined the spur which was revealed on his x-rays and MRI's about which Dr. Bloomfield was concerned was "nothing that look[ed] too terrible." Dr. France found "there [was] nothing in [Plaintiff's] spine that would really be explaining his symptoms down his leg." Dr. France opined Plaintiff "had a bad accident and probably had some kind of noxious stimulus like a spasm, which touched off this chronic pain syndrome" and did not recommend surgery. Dr. France recommended conservative treatment to Plaintiff, which included treatment at a pain clinic and with a chronic pain psychologist and receiving a spinal cord stimulator or Morphine pump from Dr. Bloomfield (R. 267).

On December 21, 1998, Plaintiff was evaluated by Howard H. Kaufman, M.D., Chairman of the Department of Neurosurgery at West Virginia University. Dr. Kaufman reviewed Plaintiff's

lumbar MRI and opined the bulge shown thereon was not significant. He noted Plaintiff's cervical myelogram and CT scan showed a right paramedian spur at C5/ and a small disc at right paramedian C6/7 (R. 288). Dr. Kaufman found Plaintiff was positive for Lhermitte sign upon examination.[1] He noted Plaintiff's motor and sensory functions were normal, "except for decreased sensation on both sides from the second finger around to about 2 inches above the wrist medially." Slight diffuse tenderness was observed midline at the low back. Plaintiff had normal strength and feeling in both legs. Dr. Kaufman observed Plaintiff had difficulty heel walking, had extremely brisk reflexes in his arms and legs, and silent plantar reflexes. Dr. Kaufman diagnosed cervical radiculopathy and "significant stress reaction with deconditioning and chronic illness behavior." Dr. Kaufman requested approval for a psychiatric consultation for pain from Worker's Compensation for Plaintiff. Dr. Kaufman noted he "would consider [Plaintiff] for a C5/6 corpectomy with allograft graft and plate" (R. 289).

On January 1, 1999, Plaintiff reported to Dr. Irvin that he was informed by three neurosurgeons and the spinal surgery chairman at West Virginia University Hospital that he was not a candidate for surgery. Dr. Irvin recommended Plaintiff seek treatment at the West Virginia University Pain Center (R. 402).

On February 10, 1999, Plaintiff underwent an evaluation by Anne Zappacosta, M.D., a resident in the Behavioral Medicine and Psychiatry department at West Virginia University (R. 341). Plaintiff informed Dr. Zappacosta he lived at home with his wife, who underwent dialysis three times per week, and a seventeen-year-old son, who was about to graduate from high school and have a

---

[1]Lhermitte's sign: the development of sudden, transient, electric-like shocks spreading down the body when the patient flexes the head forward. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 1642.

child of his own. Plaintiff denied a history of sexual abuse or physical abuse. He admitted to smoking, but he denied any drug or alcohol problems. Plaintiff stated his activities included walking his dog, taking his wife to dialysis, talking to a friend, and using his CB radio. Plaintiff informed Dr. Zappacosta that he was no longer receiving Worker's Compensation, Worker's Compensation was still paying for his medical needs, and Worker's Compensation was "sending him to a rehabilitation specialist" (R. 342).

Plaintiff informed Dr. Zappacosta he experienced daily headaches, which were somewhat relieved with Percocet; bilateral arm numbness; being cold and sweaty; night sweats every night; lower back pain; and neck pain. She found Plaintiff was pleasant and cooperative, was alert, and was oriented "x4." Plaintiff's affect was depressed and his sleep was poor. Plaintiff reported he had "a nightmare almost every night regarding the accident and flashbacks regarding these events during the day." Plaintiff took one Valium daily to ease his anxiety and agitation. Plaintiff stated he had a poor appetite and was tearful. Plaintiff did not have anhedonia. Dr. Zappacosta found Plaintiff had good insight, intact judgment, and did not exhibit paranoia (R. 342). Dr. Zappacosta found the following: Axis I – "PTSD. Pain with psychological and medical features. Major depressive disorder secondary to medical condition"; Axis II – deferred; Axis III – chronic pain syndrome, C5-C6 fusion, and headaches; Axis V – fifty percent. Dr. Zappacosta found Plaintiff's depression was secondary to his chronic pain and limited activity (R. 343).

Dr. Zappacosta prescribed Paxil to Plaintiff, referred Plaintiff to the pain clinic, referred Plaintiff to the Trauma Recovery Institute for treatment of his flashbacks and nightmares, and instructed Plaintiff to return in three weeks (R. 343).

On February 19, 1999, Plaintiff reported to Dr. Irvin that his treatments at the Multi-

Disciplinary Pain Center provided "some relief" to his pain (R. 401).

On March 19, 1999, Plaintiff informed Dr. Irvin that he was "doing well" with his treatment at the pain clinic. Dr. Irvin refilled Plaintiff's pain medication prescriptions (R. 401).

On April 19, 1999, Plaintiff returned to Dr. Irvin for refills to his prescriptions for Paxil, Valium, Amitryptyline, and Percocet (R. 400).

On May 20, 1999, Plaintiff's examination by Dr. Irvin was "unremarkable, unchanged." Plaintiff was instructed to continue his medications (R. 399).

On May 24, 1999, Sandra Mehringer, M.D., a resident at Chestnut Ridge Hospital, and Donald Fidler, M.D., a psychiatrist at Chestnut Ridge Hospital, corresponded with Dr. Irvin relative to their treatment of Plaintiff. They wrote Plaintiff had been referred by Dr. Kaufman and was first seen as an outpatient on February 10, 1999, with "recurrent thoughts of a previous motor vehicle accident." Plaintiff had been diagnosed with major depressive disorder secondary to a medical condition, posttraumatic stress disorder, and pain disorder with psychiatric and medical features. Drs. Mehringer and Fidler wrote they prescribed Paxil to Plaintiff and increased his dosage of Elavil. They noted Plaintiff had been "seen intermittently" by them for "medication checks," they were going to treat Plaintiff monthly for his depression symptoms, and they had referred Plaintiff to the Trauma Research Institute for therapy for his PTSD symptoms. Dr. Mehringer and Fidler informed Dr. Irvin that Plaintiff's "depressive symptoms appear[ed] to be stabilized on his current antidepressant medication" (R. 339).

On August 3, 1999, Plaintiff reported to Dr. Irvin that he "had some difficulty with Dr. Kaufman in Morgantown" and was being seen at Chestnut Ridge for "psychiatric care and pain control." Dr. Irvin opined he was weaning Plaintiff "down off his Percocet and Valium" and his

10

prescription was "cut back to 150 Percocet this month and 120 Valiums" (R. 398).

On September 2, 1999, Plaintiff was examined by Dr. Irvin, who opined his condition was unchanged. Dr. Irvin continued his efforts to "slowly wean" Plaintiff from his pain medications, providing him "150 [Percocet] for this month and 120 Valiums" (R. 397).

On September 30, 1999, Plaintiff complained of low back pain to Dr. Irvin. Dr. Irvin assessed lumbar strain and opined Plaintiff neurological examination was normal. He prescribed rest and heat applications. Dr. Irvin provided Plaintiff a one-month prescription for one-hundred-fifty Percocet and one-hundred-twenty Valium (R. 396).

On October 28, 1999, Plaintiff presented to Dr. Irvin with neck pain, right shoulder pain, and left leg pain. Dr. Irvin prescribed Paxil, Valium, Amitryptyline, and Percocet (R. 396).

On November 15, 1999, Plaintiff was evaluated at the Neurosurgery Clinic at the School of Medicine at the University of Pittsburgh by Donald W. Marion, M.D., upon referral by Dr. Irvin. Plaintiff informed Dr. Marion he experienced "occipital headaches that radiate[d] to the frontal region that occur daily and last[ed] until medications ease[d] the pain." Plaintiff stated he ingested two tablets of Percocet every four to six hours and MS Contin for his pain. Plaintiff stated he experienced pain on a "10/10" level on a severe day and a "3-5/10" on a good day. Plaintiff described the following pain: bilateral arm pain, intrascapular pain, pain that radiated to fingers on right, numbness on the right, left shoulder pain, left side numbness, intermittent low back pain, left leg pain, and right foot numbness (R. 313).

Dr. Marion's examination of Plaintiff revealed no acute distress, motor examination was "5/5 for both upper and lower extremities," sensory in upper extremities was intact, sensation in diffuse lower extremity was diminished as to touch and pinprick, and deep tendon reflexes were brisk. Dr.

Marion reviewed Plaintiff's lumbosacral MRI and noted it revealed disc bulging, but no acute disc herniation (R. 313). Dr. Marion recommended Plaintiff obtain a current cervical MRI. He prescribed traction, ibuprofen, and Flexeril for treatment of Plaintiff's pain (R. 314).

On November 23, 1999, Plaintiff was examined by Stephen Cain, M.D., a resident doctor at West Virginia University Hospital's Center for Pain Management, at the request of Dr. Irvin. Plaintiff informed Dr. Cain he experienced pain in his neck, shoulder, left leg, lower back, and head. Plaintiff described his pain as a "5 out of 10 on the VAS scale" and was "stabbing, tender, tingling, and occasionally numb as well as burning." Plaintiff informed Dr. Cain his hands were cool, clammy, and sweaty. Plaintiff stated he was depressed, his energy level was poor, and his appetite was poor. Plaintiff informed Dr. Cain that lying down, sitting, standing, walking, and changes in weather increased his pain. Plaintiff stated he achieved two hours of uninterrupted sleep per night and awoke due to pain. Dr. Cain reviewed Plaintiff CT scan, which showed "central C4-5 and C6-7 compression as well as C4-5 disc herniation with moderate stenosis" (R. 318).

Dr. Cain observed the following during Plaintiff's neurological/musculoskeletal examinations: Plaintiff had appropriate speech; his memory was intact; he appeared nervous and moved his extremities "constantly"; his gait and station were slow; he had normal posture; and his "2 through 12" cranial nerves were grossly intact (R. 319). Dr. Cain found Plaintiff had "limited cervical extension and lateral tilts and rotation which [were] limited by pain"; "pain to axial compression of his head"; "positive greater occipital nerves bilaterally to palpation"; "excoriations bilaterally of the upper extremities" due to his scratching because of "needle-like pain"; "positive sacroiliac joint distraction on the right and strongly positive Gaenslen's test on the left"; and "positive pain with extension and rotation on the left." Dr. Cain's diagnostic impression was for

12

cervical disc herniation at C4-5, with nerve root compression; "probable left lumbar facet joint arthropathy"; and "possible sacroiliac joint arthropathy." Dr. Cain's proposed treatment plan for Plaintiff was to continue his prescriptions for MS Contin, Elavil, Percocet, Paxil, and Valium; that his primary care physician wean him from Valium and "Percocet to 1TID"; and that he receive epidural steroid injections, which Plaintiff declined. Dr. Cain opined the Pain Clinic did not "have anything further to offer" and he "suggest[ed] [Plaintiff] return to his surgeon" (R. 320).

On November 29, 1999, Plaintiff reported to Dr. Irvin that he was told at the pain clinic that "there was nothing they could do for him" and that he had "r[u]n out" of Percocet (R. 395).

On December 20, 1999, Dr. Marion recommended to Dr. Irvin that Plaintiff undergo "a corpectomy and fusion from C4-C7 using allograft" (R. 311).

On December 30, 1999, Plaintiff reported to Dr. Irvin he was scheduled to have cervical stenosis and C-5 corpectomy surgery in Pittsburgh. Dr. Irvin renewed Plaintiff's medications (R. 393).

According to a letter written by Dr. Marion to Matthew D. Archer, Plaintiff's Medical Rehabilitative Services Case Manager, Plaintiff underwent "C5-C6 anterior cervical corpectomies and C4-C7 anterior-cervical fusion" surgery on January 11, 2000 (R. 308, 309).

On February 15, 2000, Plaintiff reported to Dr. Irvin that he had undergone surgery, which resolved the numbness and neurological symptoms in his arms. Dr. Irvin discussed "slowly . . . try[ing] to wean" Plaintiff off his pain medications. Dr. Irvin noted Plaintiff was "willing to . . . give [that effort] a try." Dr. Irvin also noted Plaintiff had been charged with a third offense driving under the influence (R. 392).

On February 21, 2000, Dr. Marion corresponded to Dr. Irvin relative to Plaintiff's post-

surgery progress. Dr. Marion reported Plaintiff's "neck pain . . . [and] right upper extremity symptoms [were] . . . resolved." Plaintiff informed Dr. Marion that he still experienced some "numbness in the C6 dermatomal distribution on the left." He demonstrated normal lower and upper extremity strength and sensation. Dr. Marion opined the lower extent of Plaintiff's anterior cervical plate was somewhat displaced, but stable. He instructed Plaintiff to wear the "Miami-J collar for another two months" (R. 308).

On April 14, 2000, Plaintiff phoned Dr. Irvin and reported that "somebody [had stolen] the prescription out of his car. Dr. Irvin renewed Plaintiff's prescription for Percocet. Dr. Irvin encouraged Plaintiff to seek treatment at a "drug rehab or pain [management] center" (R. 391).

On May 4, 2000, Plaintiff was observed by Dr. Irvin as experiencing chronic discomfort and anxiousness. Dr. Irving noted he would treat Plaintiff as a chronic pain patient and prescribed MS Contin and Percocet to him (R. 391).

On June 6, 2000, Plaintiff reported to Dr. Irvin that he had been out of pain medications for about three or four days. Dr. Irvin opined Plaintiff, who was "cool and clammy, shaking," was in "obvious withdrawal." Dr. Irvin again reiterated his intention to wean Plaintiff off his pain medications. He prescribed Percocet and MS Contin in reduced dosages (R. 390).

On July 3, 2000, Plaintiff returned to Dr. Irvin for a follow up to his chronic pain. He was cold and clammy, but less anxious. Dr. Irvin decreased Plaintiff's MS Contin. Plaintiff was medicated with MS Contin, Percocet, Valium, Paxil and Amyltriptolene (R. 389).

On August 1, 2000, Plaintiff reported to Dr. Irvin that he was unable to decrease the dosage of MS Contin. Dr. Irvin increased Plaintiff's MS Contin dosage and refilled the prescription of Percocet (R. 389).

On August 29, 2000, Plaintiff returned to Dr. Irvin, who administered Toradol "in the office" for treatment of Plaintiff's pain and continued Plaintiff on his pain medications (R. 388).

On September 28, 2000, Plaintiff presented to Dr. Irvin for treatment of chronic pain. Dr. Irvin noted that "as far as [he knew Plaintiff was] not getting prescriptions from anybody else" and that Plaintiff was "actually very, very compliant with his medical treatment." Plaintiff requested Toradol, which was provided. Dr. Irvin prescribed MS Contin (R. 388).

On October 27, 2000, Plaintiff returned to Dr. Irvin, who opined Plaintiff's pain was "pretty well controlled" with medication and noted Plaintiff had "not been excellerating [sic] the dose of his meds lately." Dr. Irving continued Plaintiff's current medications and recommended a EMG (R. 386).

On December 11, 2000, Plaintiff presented to Dr. Irvin, who discussed use of pain medication with Plaintiff. Dr. Irvin noted Plaintiff was using "to [sic] much of the pain medicine," which was "quite a problem . . . ." Dr. Irvin instructed Plaintiff that he was to "take an MS Contin twice a day and only up to 4 Percocet a day." Dr. Irvin also noted concern about Plaintiff's alcohol consumption and advised him to drink "absolutely no alcohol," or his medication prescriptions would have to be stopped and Plaintiff would "have to find himself a different Physician." Plaintiff declined Dr. Irvin's offer of in-patient placement in an alcohol and drug rehabilitation (R. 386).

On January 30, 2001, Dr. Irvin opined Plaintiff had been temporarily totally disabled from November 3, 2000 to January 30, 2001 (R. 382).

On February 9, 2001, Plaintiff underwent an EMG, which showed "right median neuropathy at wrist (carpal tunnel syndrome, mild-moderate)," "left median neuropathy at wrist (mild-moderate)," and "right C7 radiculopathy, chronic." The EMG showed "no acute cervical

radiculopathy root findings" (R. 642-43).

On March 1, 2001, Plaintiff returned to Dr. Irvin for a refill on all medications. He reported he was doing well. Weaning Plaintiff from his medications was again discussed (R. 381).

On April 2, 2001, Dr. Irvin noted Plaintiff was "stable on his current medications," but "consistently ask[ed] for more meds." Dr. Irvin encouraged Plaintiff to enter drug rehabilitation so he could achieve treatment with the lowest possible dose of narcotics (R. 381).

On May 9, 2001, Robert Baraff, M.D., evaluated Plaintiff and reported his findings to Medical Consultants Network, in connection with Plaintiff's Worker's Compensation claim. Plaintiff informed Dr. Baraff his past medical history included repair of a right forearm fracture as a child, shrapnel in his chest and right hand, and hypertension. Plaintiff stated he was medicated with Atenolol, Paxil, Valium, MS Contin, Percocet, Amyltriptolene, and Trazodone. Plaintiff stated he had reduced his cigarette smoking from one and one-half packages per day to one-half to three-quarter packages of cigarettes per day. Plaintiff asserted he did not "misuse alcohol, caffeine or drugs." Plaintiff stated his symptoms were as follows: neck pain that radiated into both arms, lower back pain radiating into his legs, and neck pain that is worse with cervical range of motion and use of arms (R. 349). Plaintiff informed Dr. Baraff that his condition was not improved after his January 11, 2000, surgery, in that he still experienced cervical discomfort radiating into his arms and legs, had impaired cervical range of motion, and had constant neck pain (R. 349-50). Plaintiff stated his wife sometimes had to help him out of bed and help him dress. Plaintiff informed Dr. Baraff that he had to perform his activities of daily living "slowly and carefully" (R. 350).

Dr. Baraff's examination of Plaintiff revealed the following: Plaintiff was oriented times three; he was in mild distress; he had no aphasia, dementia, or dysarthia; his cranial nerves were

intact; Plaintiff could stand on his heels and his toes; he presented with no atrophy or fasciculations; he had a slow gait; he was positive for significant impairment of flexion, lateral rotation and extension of his neck; Plaintiff had mild cervical paravertebral muscle spasms; he had no thoracic or lumbar paraverteral muscle spasm; his flexion at the waist was sixty degrees with back and left leg pain; Plaintiff's extension and lateral bending at the waist resulted in minimal lower back pain; his straight leg raising test was to eighty degrees on the right and sixty degrees on the left; and his mental status was within normal limits. Dr. Baraff diagnosed cervical strain with cervical radiculopathy; cervical spondylosis, with myelopathy and radiculopathy; and anterior cervical discectomy with fusion (R. 350). Dr. Baraff opined Plaintiff had reached maximum medical improvement. He recommended Plaintiff not have any further treatment for his cervical condition. Dr. Baraff found Plaintiff was "unable to return to work in a modified work capacity" and "unable to return to work in any gainful capacity with or without restriction" (R. 351).

On May 24, 2001, Plaintiff phoned Dr. Irvin, and requested more pain medications. He informed Dr. Irvin he was experiencing "acute withdrawal and . . . admitted . . . that he had been using street drugs in addition to his prescribed pain treatment." Dr. Irvin informed Plaintiff he would not prescribe further medication to him. Plaintiff agreed to enter an in-patient drug rehabilitation program (R. 379).

On June 7, 2001, Plaintiff phoned Dr. Irvin and asked "for help w/the pain medications." Plaintiff had refused to enter an in-patient drug rehabilitation program. Dr. Irvin informed Plaintiff he needed to find a new physician and provided Plaintiff with the names of two doctors who were accepting new patients (R. 377).

On June 11, 2001, Plaintiff telephoned Dr. Irvin relative to his misuse of pain medications,

and Dr. Irvin agreed to begin treating Plaintiff again. Plaintiff informed Dr. Irvin he would not go into in-patient drug rehabilitation because he had to transport his wife to dialysis treatments, but he did agree to wean himself from pain medications and participate in an out-patient drug rehabilitation program. Dr. Irvin prescribed MS Contin to 40mg and provided sixty Percocet to Plaintiff. He instructed Plaintiff to return in two weeks (R. 376).

On June 25, 2001, Plaintiff reported to Dr. Irvin that he was doing "very poorly." His pain was severe and he was not able to "wean . . . down at all off his meds" (R. 376).

On July 9, 2001, Plaintiff presented to Dr. Irvin, who observed Plaintiff continued to "do very poorly w/trying to wean down off the pain meds." Plaintiff informed Dr. Irvin that his appointment for out-patient drug rehabilitation had been delayed. Dr. Irvin prescribed MS Contin 60mg, twice per day, and provided Plaintiff eighty-four Percocet for a two-week period (R. 374).

On August 7, 2001, Plaintiff reported to Dr. Irvin that he was doing "okay" on his current medication dosages and was not taking any other drug for pain. Dr. Irvin prescribed MS Contin 45mg, twice daily, and reduced Plaintiff's dosage of Percocet from two to one tablet every four hours (R. 373).

On August 28, 2001, Plaintiff reported to Dr. Irvin that he had fallen at home, which caused spasms in his back. Dr. Irvin ordered a MRI of Plaintiff's back, increased the MS Contin to 100mg twice daily and ordered Plaintiff to continue Percocet as prescribed (R. 372).

On October 2, 2001, Plaintiff's wife telephoned Dr. Irvin to report that Plaintiff had exhausted his thirty-day prescriptions in twenty-seven days. Dr. Irvin noted Plaintiff's continued refusal to enter out-patient or in-patient drug rehabilitation programs. Dr. Irvin also noted his decision to inform Plaintiff on October 9, 2001, that he would have to seek the care of another

physician (R. 371).

On October 9, 2001, Plaintiff reported to Dr. Irvin that he had to take extra medication due to his having fallen down the stairs, had reported to the emergency room for pain treatment, and at attempted to contact Dr. Irvin to inform him of this development, but was unable to do so because of his condition. Dr. Irvin refilled Plaintiff's prescriptions for one more month (R. 370).

On November 3, 2001, Plaintiff underwent a lumbar MRI. It revealed the following: 1) transitional vertebral body at L5-S1; "mild interspace narrowing, decreased signal of the intervertebral disc on the T2 and small central disc herniation at the level immediately above the transitional vertebral body and mild interspace narrowing, decreased signal of the intervertebral disc on T2 and a small central disc herniation two levels above the transitional vertebral body"; and "when compared with the examination of 11/15/97 the findings are not significantly changed" (R. 352-53).

On November 5, 2001, Plaintiff reported to Dr. Irvin that he had been doing well. Dr. Irvin prescribed one-hundred Percocet and MS Contin100mg to Plaintiff (R. 369).

On December 4, 2001, Plaintiff reported to Dr. Irvin he was feeling better on his current dosages of medications. Plaintiff informed Dr. Irvin he was relying less on Percocet to control his pain. Dr. Irvin prescribed MS Contin 130mg, twice per day (R. 369).

On February 4, 2002, Plaintiff presented to Dr. Irvin for treatment of chronic pain syndrome. He reported "doing pretty well." Plaintiff informed Dr. Irvin he was not longer taking Percocet and was not obtaining drugs from any other source (R. 368).

On March 1, 2002, Plaintiff reported to Dr. Irvin he intended to be examined by a neurosurgeon the following week. He was experiencing severe pain, and Dr. Irvin told him he

needed to seek treatment at a pain clinic as he could not relieve Plaintiff's symptoms. Dr. Irvin ordered a urine analysis of Plaintiff to check for the presence of drugs and/or alcohol (R. 367).

On April 4, 2002, Plaintiff reported to Dr. Irvin that he had to cancel his appointment at the pain clinic. Dr. Irvin agreed to treat Plaintiff until he could seek treatment at the clinic. Plaintiff reported his pain was six-to-eight "most times," but sometimes decreased to four. Dr. Irvin made an April 18, 2002, appointment for Plaintiff at the pain clinic (R. 366).

Plaintiff reported to Dr. Irvin on April 18, 2002, that he kept his appointment at the pain clinic, he was scheduled to meet with a psychiatrist in two weeks, and had been admitted into the narcotics program. Dr. Irvin renewed Plaintiff's prescription for MS Contin (R. 365).

On June 5, 2002, Dr. Irvin gave Plaintiff a thirty-day notice that he was not longer Dr. Irvin's patient due to his not complying with Dr. Irvin's recommendations and instructions. Plaintiff had phoned Dr. Irvin's office demanding additional medication and reporting he was going to be incarcerated in the next couple weeks. Dr. Irvin prescribed MS Contin to Plaintiff. Dr. Irvin wrote he would assist Plaintiff in obtaining new medical care (R. 364-65).

On June 6, 2002, Derek H. Andreini, M.D., evaluated Plaintiff at the request of Worker's Compensation (R. 359). Dr. Andreini noted Plaintiff had been "seen" by "numerous and various physicians" and was a "poor historian" of his medical care. Plaintiff informed Dr. Andreini that his pain "remained unchanged" in that it was constant, it was in his neck and lower back, it interfered with his activities of daily living, activity exacerbated his pain, and it caused his left leg to give out on him and made him fall. Plaintiff informed Dr. Andreini that he was being medicated for his symptoms with Paxil, Valium, and MS Contin. Dr. Andreini found Plaintiff had reached his maximum degree of medical improvement and required no further medical or surgical interventions.

Dr. Andreini opined Plaintiff's pain should be managed by Dr. Irvin. Dr. Andreini found Plaintiff was totally and permanently disabled as he could not return to his past work or obtain any other work due to his age, education, and vocation background. Dr. Andreini opined any attempt at vocational rehabilitation "would be futile" (R. 360). In his report, Dr. Andreini noted "the low back examination is well documented on the green low back Workers' Compensation form." Dr. Andreini noted he had reviewed a MRI of Plaintiff's lumbosacral spine, "which showed disc bulging but no evidence of acute disc herniation" (R. 360).

On July 8, 2002, Dr. Irvin noted Plaintiff's screening at the pain clinic revealed his use of illegal drugs. On that same date, Plaintiff's wife telephoned Dr. Irvin and requested additional pain medication for Plaintiff. Dr. Irvin declined to provide prescription medication to Plaintiff and instead recommended an in-patient drug rehabilitation for him (R. 363). Plaintiff presented at Dr. Irvin's office. At Plaintiff's request, Dr. Irvin provided fourteen MS Contin 60mg to Plaintiff. He also made an appointment for him at the Industrial Medical Center. Dr. Irvin told Plaintiff not to return to his office, as he felt Plaintiff was harassing him. Dr. Irvin informed Plaintiff that if he did return to his office, he would contact the legal authorities (R. 363).

On June 28, 2002, Plaintiff reported the Wetzel County Hospital with complaints of headache and neck pain. X-rays were made of Plaintiff's cervical spine, which revealed "post-surgical changes of the cervical spine," and lumbar spine, which revealed "mild degenerative changes" (R. 434).

On July 8, 2002, Plaintiff reported to Wetzel County Hospital with headache and shoulder pain (R. 431). Joseph H. Duvert, M.D., who treated Plaintiff, noted he was "basically looking for more pain medications." Plaintiff informed Dr. Duvert his "doctor [had] changed practices and he [had] been unable to reach the new doctor." Dr. Duvert treated Plaintiff with Toradol, Flexeril, and

Vicodin at the hospital (R. 432).

On July 17, 2002, Plaintiff was admitted to the Ohio Valley Medical Center for chest pain. He was treated with a Cardizem drip, which was discontinued after the "EKG was accurately interpreted." It was noted in the Discharge Summary that "[i]nterestingly, [Plaintiff's] wife was here at the exact time with chest pain. They were both found to have cocaine, barbiturates and opiates in their urine. [Plaintiff] denied adamantly, cocaine and crack usage, but his wife admitted them [sic] taking it prior to admission. [Plaintiff] appeared to be going into withdrawal symptoms, shaky, clammy from opiates." Plaintiff's cardiac enzymes were ruled out and his "echo . . . revealed a normal ejection fraction and mild mitral regurgitation." Plaintiff was discharged with the following diagnoses: cocaine abuse, hypertension, sinus tachycardia, nicotine addiction, and chronic neck and back pain. Plaintiff was prescribed Lopressor, aspirin, Paxil, and Valium. Recommendations made to Plaintiff at discharge were as follows: follow the American Heart Association diet, exercise, quit smoking, seek help at "Crossroads" for cocaine and narcotic abuse, undergo an outpatient exercise stress test, and follow with Dr. Norman Wood in one-to-two weeks (R. 426).

Plaintiff was examined by Dr. Fred Payne on October 1, 2002, at the request of the West Virginia Disability Determination Section. Dr. Payne noted the following symptoms, which were listed by Plaintiff and which he believed would qualify him for disability status: neck pain with bilateral radicular arm pain, suboccipital cervicogenic headaches, bilateral arm weakness, bilateral hand numbness, right shoulder joint pain, lumbar back pain with bilateral radicular leg pain, and bilateral foot numbness and right calf numbness (R. 436). Plaintiff informed Dr. Payne he did not experience any improvement after his second neck surgery. Plaintiff asserted he was unable to drive a car because his headaches sometimes caused blurred vision and he needed to "continually fidget

in order to find a comfortable sitting posture." Plaintiff stated he was unable to sit for longer than one and one-half hours at a time and to walk for further than one-eighth mile at a time. Plaintiff informed Dr. Payne he was unable to bend or climb ladders due to pain. Plaintiff could lift up to eight pounds, but not from the floor or to waist level due to pain. Plaintiff stated he "could not easily" perform reaching movements above shoulder level or push and/or pull. Plaintiff informed Dr. Payne he dropped objects easily, which caused him to grip them too tightly and break them. Plaintiff stated his foot numbness prevented him from using foot controls. He asserted he would have "no problem" walking on flat surfaces (R. 347).

Plaintiff reported to Dr. Payne he was medicated with Atenolol, Paxil, Trazadone, Valium, and Duragesic patches. Plaintiff stated the pain medication had "no effect" on his symptoms, but he took no other pain medications. Plaintiff informed Dr. Payne he smoked, did not consume alcohol, and "denie[d] any history of previous substance abuse" (R. 437).

Dr. Payne reviewed Dr. Irvin's February 4, 2002, medical report, which listed the medications he prescribed to Plaintiff; the November 2002 MRI of Plaintiff's lumbar spine; and other medical records in which it was noted Plaintiff was not a candidate for surgery, Plaintiff had refused to enter a drug rehabilitation programs, and Plaintiff was referred to the pain clinic (R. 437). Dr. Payne noted the following results of his examination of Plaintiff: "[t]enderness was noted over the lumbosacral area to a very marked degree and with only very light palpation!"; no lumbar spasm or guarding; moderate bilateral buttock tenderness; no calf tenderness; mild bilateral posterior thigh tenderness to palpation; no palpable scoliosis or pelvic tilt; forward lumbar flexion was forty-five degrees; bilateral lateral tilt was fifteen degrees; right rotation was approximately fifteen degrees; unable to rotate at all to the left side; and unable to extend his lumbar region. Dr. Payne wrote, "It

was interesting to note that the patient had a tendency to stand with both knees in 35 degrees of flexion!" Additionally, Dr. Payne noted the "lower limbs revealed an extreme amount of bilateral leg weakness." Plaintiff's sitting straight leg raising test was forty degrees on the left and forty-five degrees on the right. Dr. Payne observed Plaintiff's "casual gait was essentially normal," if "rather slow." Plaintiff's tandem gait walking was normal and he was able to heel and toe walk, with difficulty. Romberg test was negative. Plaintiff was unable to hop on the left leg and could only hop once on the right leg. Plaintiff could fully squat, but required assistance in standing from a squat position (R. 438).

Dr. Payne's examination of Plaintiff's neck revealed "tenderness to a marked degree over the entire posterior cervical region but . . . no torticollis . . . [or] any muscle spasm or guarding." Forward neck flexion was thirty degrees and cervical extension was fifteen degrees. Lateral neck flexion was fifteen degrees, right neck rotation was five degrees, and left neck rotation was ten degrees. Plaintiff revealed normal strength in bilateral arm abduction during Dr. Payne's motor examination of the upper limbs. Dr. Payne's sensory examination of Plaintiff's upper limbs revealed "hypoalgesia over the entire aspect of both arms, forearms and hands" (R. 439).

Dr. Payne's diagnoses were as follows: "probable somatization disorder"; "cervical ankylosis secondary to multiple level interbody strut graft fusion"; anxiety disorder; "multiple level lumbar disc herniations"; "systemic hypertension (by history)"; and "possible affective disorder (depression)" (R. 439).

Dr. Payne opined Plaintiff would "be unable to participate in activities requiring full movement of the neck" or that required "frequent bending, reaching or pushing and pulling" (R. 439). Dr. Payne found Plaintiff's "limited and painful range of motion would prevent [him] from

24

engaging in repetitive lifting or twisting and turning activities." Additionally, Dr. Payne opined "[t]here were sensory findings involving the upper and lower limbs which were nondermatomal. The [Plaintiff's] bilateral +3/5 lower limb weakness would have prevented him from not only mounting and dismounting from the examination table but this level of weakness would have prevented him from hopping on his right leg and certainly would have prevented him from squatting. This . . . suggests the possibility of malingering. There were no impairments of the deep tendon reflexes of the lower limbs in keeping with the profound nature of the motor weakness. This fact reinforces the consideration that malingering was being evidence" (R. 440).

On October 2, 2002, Plaintiff underwent a Mental Status Evaluation for the West Virginia Disability Determination Service. Frank B. Eibl, Jr., M.A., completed the evaluation (R. 441). Plaintiff reported he had no hallucinations, paranoid ideations, delusions, thought broadcasting, thought insertions, obsessive-compulsive difficulties, agoraphobia, suicidal ideations, suicidal attempts, or homicidal ideations. Plaintiff reported he was disoriented at times as to direction; had racing thoughts; experienced panic-like symptoms with heart palpitations, difficulty breathing, and smothering sensation; was fearful; had some PTSD features related to his motor vehicle accident; had infrequent nightmares; had fear of heights; experienced anxiety and tension; became easily upset; became easily frustrated; was moody and irritable; had difficulty coping with daily stresses and pressures; had difficulty making daily decisions; felt depressed; experienced low moral; experienced low energy; felt hopeless, useless, and worthless; cried; worried; "stay[ed] to himself"; unable to engage in "pleasurable activities," but was still interested in pursing them; had a poor appetite; had difficulty sleeping; experienced short-term forgetfulness; had difficulty with attention and concentration; was easily distracted; and had difficulty staying focused on tasks and completing

25

tasks (R. 442).

Plaintiff reported a history of alcohol abuse, but did not "mention any type of opiate use" (R. 443). Plaintiff was observed as being adequately alert, generally cooperative, motivated, and oriented in all spheres. Plaintiff's eye contact was appropriate, verbal ability was adequate, speech was normal, thought processes were intact, thought content was normal, insight was adequate, and judgment was average. Plaintiff's mood was observed as depressed and his affect was flat. Mr. Eibl found the following: concentration was mildly deficient; social functioning was within normal limits; immediate memory was mildly deficient; recent memory was within normal limits; long-term memory was mildly deficient; persistence was normal; and pace was normal (R. 444). Mr. Eibl made the following diagnostic impression: Axis I – mood disorder due to a general medical condition with depressive features, generalized anxiety disorder with panic features, and PTSD features; Axis II – deferred; and Axis III – continued back, neck, shoulder, and arm pain secondary to injury. Mr. Eibl found Plaintiff's prognosis was fair (R. 445).

Plaintiff described his activities of daily living as follows: arose at different times, experienced pain and stiffness upon waking, sometimes needed assistance rising from bed, sometimes ate breakfast, sat "around," watched television, ate lunch, lay down, sat 'around," watched more television, had dinner, watched more television, and retired at 2:00 a.m. Plaintiff stated he did some cooking and bathed once per week. Plaintiff reported he did not do laundry, did not clean the house, did not do yard work, did not drive as his license was suspended, did not shop, did not visit others, did not talk on the telephone, did not eat out in restaurants, did not belong to any groups, did not attend church, and had no hobbies (R. 445).

Mr. Eibl found Plaintiff could "possibly benefit from participating in Pain and Stress

Management Program to help him cope and adjust with his continued medical and physical difficulties . . ." and should consider participation in "AA or NA" (R. 446).

On October 29, 2002, Frank D. Roman, Ed.D., completed a Psychiatric Review Technique of Plaintiff. Dr. Roman found Plaintiff had impairments that were not severe. This assessment was based on Dr. Roman finding Plaintiff had anxiety-related disorders and affective disorders (R. 523). Dr. Roman found Plaintiff was mildly limited in his activities of daily living, social functioning, and his ability to maintain concentration, persistence, and pace (R. 533).

On December 30, 2002, Plaintiff began seeking care at the Shadyside Clinic. It appears from the treatment notes that Norman E. Wood, D.O., treated Plaintiff through February 19, 2004 (R. 561-608).

On January 28, 2003, James H. Wiley, M.D., evaluated Plaintiff. Plaintiff reported he was taking Paxil, Trazadone, Valium, and using the Duragesic patch (R. 447). Dr. Wiley opined Plaintiff was in good general health and did not use a cane, crutch, walker, or lumbar wrap (R. 448). Dr. Wiley reviewed the medical records of Plaintiff (R. 449-54). Plaintiff reported he experienced constant lower back pain, which extended to both lower extremities. Plaintiff reported he experienced numbness in his lower extremities. Plaintiff stated increased activities, "coughing or sneezing, prolonged sitting, bending, lifting, stooping, [and] pushing or pulling" made his symptoms worse. Plaintiff stated he was awakened by pain nightly and achieved one-to-two hours of sleep per night before awakening. Plaintiff stated he could walk up to one-fourth mile and could not drive. Plaintiff also reported he experienced constant neck pain, which extended into his arms, right worse than left and which was made worse by coughing, sneezing, bending forward, lifting, pushing, pulling, or turning his head in either direction. Plaintiff stated he also experienced headaches, which

27

occurred "almost every day" (R. 454). Dr. Wiley noted Plaintiff stood with an "almost normal stance" and that his gait was antalgic "over the left lower extremity." Plaintiff's pelvis and shoulders were level, he had normal dorsal kyphosis and lumbar lordosis, he could heel and toe walk, he could sit normally, and had full range of motions of his hips, knees, ankles, and feet. Plaintiff could not squat and demonstrated weakness in his left thigh and calf (R. 455). Plaintiff demonstrated satisfactory grip, arm and shoulder strength (R. 456).

Dr. Wiley had cervical and lumbar x-rays made of Plaintiff. Plaintiff's cervical spine x-ray showed "minimal tilt to the left and odontoid normal." It revealed no encroachment on the neuroforaminal spaces. Plaintiff's lumbar spine x-ray showed normal hips and sacroiliacs and no transitional vertebrae. There was a mild tilt to the right, but no scoliosis. Diminished L5-S1 interspace and some posterior calcification at L5-S1 were noted. Dr. Wiley's impressions was for the following: 1) sprain type injury to cervical spine; 2) cervical disc displacement with radiculopathy, status postoperative discectomy and arthrodesis of C4-5-6-7; 3) internal cervical fixation with plate and multiple screws; 4) long cervical fibular strut graft; 5) sprain type injury to lumbar spine; and 6) lumbar disc displacement with radiculopathy (R. 456). Dr. Wiley opined Plaintiff had reached maximum degree of medical improvement and had a forty-seven percent whole body permanent physical impairment (R. 457-58). Dr. Wiley found Plaintiff was permanently and totally disabled and could not be gainfully employed (R. 458).

On February 2, 2003, Plaintiff was admitted to Ohio Valley Medical Center for sharp stabbing chest pain and cough. Plaintiff was diagnosed with pulmonary abscess, right bronchopulmonary fistula, right pneumothorax, opiate abuse, and hypertension. Plaintiff was treated with Levaquin and Zithromax. Plaintiff was prescribed Duragesic patch, Paxil, Humibid LA,

Tenormin, Pepcid, Dilaudid, Clindamycin, and Zithromax and instructed to undergo home respiratory isolation (R. 468). Plaintiff was discharged on February 20, 2003 (R. 468-69).

On March 9, 2003, Plaintiff was again admitted to Ohio Valley Medical Center for pneumothorax/bronchiopleural fistula, narcotic abuse, and hypertension. Plaintiff was also diagnosed with microplasm avium complex in sputum and anemia. He was treated with Duragesic patch, Valium, Paxil, Humibid, Tenormin, Pepcid, Ferrous Sulfate, and Biaxin and released on March 11, 2003.

On April 24, 2003, Plaintiff went to the East Ohio Regional Hospital Emergency Trauma Department and requested refill on his pain medications. Plaintiff informed Michael Kovalick, D.O., that his primary care physician had instructed him to report to the emergency department to obtain pain medications (R. 508). Dr. Kovalick instructed Plaintiff to seek treatment for his chronic pain from "one physician and one physician only" and refused to provide Plaintiff the requested medications. Plaintiff "was not happy with [Dr. Kovalick . . ] and left very angry tht [sic] he did not get his pain pills or medications" (R. 509).

On May 10, 2003, Plaintiff presented to the Ohio Valley Medical Center Emergency Trauma Department with complaints of back pain. Shawn Posin, M.D., reviewed Plaintiff's records and noted he had been seen twice in the emergency department seeking pain medications (R. 506). Dr. Posin wrote he "was very concerned about [Plaintiff's] drug seeking behavior and [did] not feel comfortable giving him narcotics." Dr. Posin did not provide Duragesic or MS Contin to Plaintiff, but prescribed Ultracet and provided a shot of Toradol to Plaintiff. Dr. Posin informed Plaintiff he would have to obtain his narcotic drugs at the pain clinic, where he was being treated for chronic pain (R. 507).

29

On May 14, 2003, Maria T. Moran, Ph.D., completed a psychological evaluation of Plaintiff. Plaintiff reported his mood was "worried, nervous, and depressed." Plaintiff stated he experienced sleep and appetite disturbances, decreased interest and enjoyment in activities, crying spells, feelings of guilt and worthlessness, flashbacks and nightmares about the motor vehicle accident, anxiety and hypervigilance when a passenger in a car, panic attacks, and poor memory and concentration. Plaintiff informed Dr. Moran that he no longer drove because of "anxiety and physical limitations related to pain" (R. 545).

Plaintiff scored the following in the WAIS-III: Verbal IQ was eighty-three, Performance IQ was eighty-six, and Full Scale IQ was eighty-four. Dr. Moran opined Plaintiff's intellectual functioning was in the low average range. Dr. Moran found Plaintiff experienced chronic pain, post-traumatic stress disorder, and depression as a result of a motor vehicle injury. Dr. Moran opined Plaintiff's "psychological profile was indicative of somatic focus and significant psychological distress." Dr. Moran opined a re-evaluation of Plaintiff's medication regimen needed to be conducted to "optimize its effectiveness" and that Plaintiff should undergo "concrete, problem-focused treatment that . . . addresses physical functioning" and "cognitive-behavioral therapy," as it was "often effective in the treatment of PTSD." Dr. Moran's prognosis of Plaintiff was guarded (R. 546).

Also on May 14, 2003, Paul L. Clausell, M.D., completed a psychiatric IME of Plaintiff. Plaintiff reported pain in his neck, head, lower back, both legs, right and shoulder. Plaintiff stated he experienced constant headaches and numbness in both hands and legs (R. 547). Plaintiff reported the following activities of daily living: minimal travel due to pain; "okay" hand function; ambulated on his own; performed personal hygiene, feeding, and dressing; could not sit for more

than one hour; could not stand for more than thirty minutes; had difficulty walking; fell easily; fed his dog; dusted furniture; and lay down for twelve to fourteen hours per day (R. 548).

Dr. Clausell found Plaintiff was alert and oriented, behaved appropriately, demonstrated normal psychomotor activity, held normal attitude toward self, had relevant and coherent voice and speech, had broad affect, had good attention and concentration, was preoccupied with pain and ability to pay bills, had no delusions, had abstract thinking, demonstrated average intellectual functioning, had good immediate retention and recall, had fair recent and past memory, had good remote memory, denied phobia or suicidal/homicidal ideations, and had good judgment (R. 550). Dr. Clausell reviewed Plaintiff medical records (R. 550-52)

Dr. Clausell made the following diagnoses: Axis I – major depressive disorder, single, moderate, and post-traumatic stress disorder, chronic and stable; Axis II – none; Axis III – chronic pain in neck, head, lower back, legs, right shoulder, numbness in hands and legs, and constant headaches, all secondary to injury; Axis IV – psychosocial stressors of financial concerns, chronic medical problems, worries regarding chronic illness of wife, and inability to afford adequate health care; and Axis V – GAF of sixty. Dr. Clausell noted Plaintiff was in "partial remission regarding his depression" and had reached maximum medical improvement with regard to the diagnoses. Dr. Clausell found Plaintiff was not disabled due to his psychiatric disorders but that Plaintiff's "work efficiency" was impacted by his "problems maintaining concentration, short term memory problems, poor ability to stay focused, increased anxiety and worrying, and decreased desire to socialize" (R. 552). Dr. Clausell recommended Plaintiff "continue to receive psychiatric treatment from his primary care physician in the form of the medications he currently receives," which should "provide some partial symptom relief and help prevent deterioration" (R. 553).

On June 27, 2003, Plaintiff reported to the Ohio Valley Medical Center Emergency Trauma Department with redness, swelling, and pain in his lower right leg. His pain was treated with Percocet. He was diagnosed with acute cellulitis and prescribed Keflex and provided two Duragesic patches. Plaintiff was discharged (R. 504-05).

On July 6, 2003, Plaintiff was admitted to the Ohio Valley Medical Center for redness, swelling, and pain of the right lower leg. He was diagnosed with right leg cellulitis, history of hypertension, history of sinus tachycardia, chronic neck and back pain, and history if cocaine abuse. He was treated with Ancef and Vicodin. Plaintiff was released on July 7, 2003 (R. 686).

On July 29, 2003, Thomas Lauderman, D.O., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push-pull unlimited (R. 515). Dr. Lauderman found Plaintiff was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl (R. 516). Dr. Lauderman found Plaintiff had no manipulative, visual, or communicative limitations (R. 517-18). Dr. Lauderman found Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards. Dr. Lauderman found Plaintiff had no limitations with regard to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation (R. 518). Dr. Lauderman reduced Plaintiff's RFC to light (R. 519).

On July 30, 2003, Joseph Kunziar, Ed.D., reviewed Plaintiff's record and the October 29, 2002, Psychiatric Review Technique completed by Dr. Roman on Plaintiff and affirmed Dr. Roman's findings (R. 523).

On August 7, 2003, Plaintiff presented to the Ohio Valley Medical Center Emergency

Trauma Department with complaints of left eye pain (R. 682). Lisa Hrutkay, D.O., contacted Dr. Wood, Plaintiff's physician, who informed her he "usually . . . [gave] him an IM injection of Vistaril" for complaints of pain and who stated he agreed with Dr. Hrutkay's recommendation that Plaintiff not be prescribed narcotics for his pain. Dr. Hrutkay provided Plaintiff "Vistaril IM" and discharged him (R. 683).

On November 20, 2003, Anil Nalluri, M.D., completed an Independent Multiaxial Psychiatric Examination of Plaintiff at the request of Jonathon C. Bowman, Plaintiff's lawyer (R. 554). Dr. Nalluri reviewed Plaintiff's medical records (R. 554-55). Plaintiff reported he had no prior history of use of "illicit psychoactive" drugs (cannabis, cocaine, LSD, heroine, etc.), had a prior history of alcohol abuse, smoked marijuana for "recreational" use "every now and then," but not for two years, had no sex life, and was unable to drive (R. 556). Dr. Nalluri noted Plaintiff's license was suspended (R. 557).

Dr. Nalluri found the following upon his mental status examination of Plaintiff: Plaintiff demonstrated no compulsive and perseverative behavior; his affect was appropriate; Plaintiff's mood was moderately depressed and moderately anxious; his speech audibility and intelligibility were average and his speech functional efficiency was below average; Plaintiff's psychomotor activity was reduced; his thought process was normal and his thought content was preoccupied without delusions; he was not homicidal or suicidal; Plaintiff's abstract thinking was normal; his concentration was decreased; Plaintiff was of average intelligence; his perception was normal; his memory was fair; Plaintiff was oriented; his self-esteem was reduced; Plaintiff's insight and judgment were fair; Plaintiff had no difficulty controlling his impulses; Plaintiff's reality contact was intact; and his mental capacity was normal(R. 557-58). Dr. Nalluri found Plaintiff's prognosis was poor. Dr.

Nalluri found the following: Axis I – major depressive disorder, single episode without psychotic features of moderate degree, and post traumatic stress disorder; Axis II – no diagnosable personality disorder and no diagnosable mental retardation; Axis III – history of cervical stenosis, cervical disc disease, lumbar sprain, and hypertension; Axis IV – general medical conditions are stressors; and Axis V – GAF was fifty-one (R. 558). Dr. Nalluri found Plaintiff had a thirty-six percent total impairment of the whole person (R. 559). Dr. Nalluri found Plaintiff had reached maximum medical improvement and recommended Plaintiff continue individual psychotherapy and medication management for his psychiatric disorders. Dr. Nalluri opined he "did not see any evidence of secondary gain, malingering or any other motivational factors" by Plaintiff (R. 560).

On December 27, 2003, Plaintiff reported to the Ohio Valley Medical Center Emergency Trauma Department requesting refills for his pain medications. Michael Matthews, D.O., prescribed four Duragesic patches to Plaintiff (R. 681).

On January 17, 2004, Plaintiff reported to the Ohio Valley Medical Center Emergency Trauma Department with reports of headache and chronic neck pain. Plaintiff stated he had not had any pain medications in twenty-four hours (R. 677). Plaintiff was prescribed Valium and provided one Duragesic patch, which was applied in the emergency department (R. 678).

On January 29, 2004, Plaintiff presented to the Emergency Trauma Department of the Ohio Valley Medical Center with a flare up of his chronic pain. Plaintiff stated he had "just run out" of his Duragesic patch. Robert C. Solomon, M.D., provided one Duragesic patch to Plaintiff (R. 676).

On February 13, 2004, Plaintiff presented to the Emergency Trauma Department of the Ohio Valley Medical Center with back pain. He stated he was due to get a refill on his Duragesic patch in two days, but needed one for the weekend. Plaintiff was provided a Duragesic patch (R. 675).

On February 23, 2004, Norman E. Wood, D.O., Plaintiff's doctor at the Shadyside Clinic, completed a Physical Residual Functional Capacity Questionnaire of Plaintiff. Dr. Wood noted he had treated Plaintiff weekly for neuralgia. Dr. Wood wrote the clinical findings and objective signs on which he relied were Plaintiff's straight leg raising test and his minimal cervical rotation (R. 540). Dr. Wood found Plaintiff's impairments lasted or would last for twelve months; Plaintiff was not a malinger; depression, psychological factors, and anxiety contributed to Plaintiff's physical condition; Plaintiff seldom experienced pain that interfered with his concentration and attention; Plaintiff was incapable of "even 'low stress' jobs"; Plaintiff could not walk the distance of a city block; Plaintiff could sit for fifteen minutes at a time before he needed to stand/walk; Plaintiff could stand for fifteen minutes before he needed to sit; Plaintiff could sit, stand, and walk for less than two hours in an eight-hour workday; Plaintiff needed to walk during the day every ten minutes for five minutes; Plaintiff needed to shift positions at will; Plaintiff would need to take frequent unscheduled breaks; Plaintiff required the use of a cane or assistive device when standing and walking; Plaintiff could never lift and/or carry twenty or fifty pounds; Plaintiff could rarely lift and/or carry less than ten pounds or ten pounds; Plaintiff could never twist, stoop, crouch, and climb ladders; Plaintiff could rarely climb stairs; and Plaintiff's impairments produced "all bad" days; (R. 541-43). Dr. Wood did not offer an opinion about the number of days, if any, Plaintiff would be absent from work because of his symptoms and limitations (R. 543).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ McDougall made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act

and is insured for benefits through December 31, 1999.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant's [sic] claimant has a history of motor vehicle accident and injury in September 1997, cervical spine and lumbar spine disorders, street drug abuse of cocaine and marijuana, prescription drug abuse, and alcohol abuse, hypertension, a history of sinus tachycardia with cocaine abuse, chronic pain syndrome (Exhibit 20F) related to psychological and physical condition, an affective disorder generally described as depression and anxiety related disorders typically including general anxiety and post-traumatic stress disorder, as well as a history of pneumonia and lung problems that resolved. The collective impairments are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4.    As of his date last insured and through the date of this decision, the medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 as discussed in the body of this decision, and the claimant has established only mild to moderate mental functional limitations as set forth in the body of this decision.

5.    The undersigned finds the claimant's allegations regarding his limitations are not totally credible as of his date last insured and through the date of this decision for the reasons set forth in the body of the decision.

6.    As of his date last insured and through the date of this decision, the claimant has retained the residual functional capacity for light with the ability to briefly (for one to [sic] minutes) change positions at least every 1/2 hour; no flexion or extension of the neck more than 5 degrees up or down; no rotation of the head or neck more than 15 degrees in either direction, right or left; no work with the general public; no close interaction with the coworkers or supervisors; no fast paced or assembly line work; no more than rare changes in the work setting; no close concentration or attention to detail for extended periods; no requirement to set his own workplace goals more than rarely; no driving or travel required as part of the job; and the claimant must be able to miss up to one day of work per month on average. (SSR 96-5p).

7.    The claimant was and continued to be unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

8.    The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

9.    The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

10.     The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case as of his date last insured and through the date of this decision (20 CFR §§ 404.1568 and 416.968).

11.     The claimant has the residual functional capacity to perform a significant range of light work as of his date last insured through the date of this decision (20 CFR §§ 404.1567 and 416.967).

12.     Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 201.21 as a framework for decision-making, there were and are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as given by the vocation expert and set forth in the body of this decision (SSR 00-4p).

13.     The claimant was not under a "disability," as defined in the Social Security Act, as of his date last insured or at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g) (R. 47-48).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper

standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff contends:

1.  The Defendant's finding that the Plaintiff is not disabled is not supported by substantial evidence.

The Commissioner contends:

1.  Substantial evidence supports the ALJ's decision (Defendant's brief at p. 12).

## C. Substantial Evidence

Plaintiff's argument is as follows:

The Plaintiff submits that the September 13, 2004, decision is not supported by substantial evidence. To be specific, the Plaintiff takes issue with the ALJ's ultimately [sic] assessment of the evidence of record. The Plaintiff duly notes that the ALJ's ruling mentions a lot of the evidence of record. However, that's about all he does correctly. In fact, the Plaintiff submits that the ALJ's account of quite of few records he discusses is completely incorrect.

In this ruling, the ALJ attempts to discredit various records by claiming that they are largely based upon the Plaintiff's subjective complaints, but offers no rationale for that opinion. Certainly, the fact that the ALJ merely mentions such evidence in his ruling cannot be deemed sufficient by any reviewing boday [sic], especially when they are the most insightful and thereby most credible reports. Such records and opinions were just not given the appropriate weight.

Plaintiff specifically argues the ALJ did not appropriately consider Dr. Baraff's May 9, 2001, report; Dr. Andreini's June 7, 2002, report; Dr. James Wiley's January 30, 2003, report; and Dr. Anil Nalluri's November 20, 2003, report. First, as to Plaintiff's contention that these four providers' opinions "were not given controlling weight based upon the ALJ's finding that the opinion were based upon the Plaintiff's subjective complaints," a review of the record indicates these providers

were all examining, and not treating physicians. For that reason alone, the ALJ could not have accorded any of their opinions controlling weight. Social Security Ruling ("SSR") 96-2p regulates when a provider's opinion may be given controlling weight: "Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources." (Emphasis added).

Further, the ALJ properly found that the providers' opinions that Plaintiff could not work were opinions on issues reserved to the Commissioner. See §404.1527(e), which provides, in pertinent part:

> *Medical source opinions on issues reserved to the Commissioner.* Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability.

> (1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

> (2) *Other opinions on issues reserved to the Commissioner.* We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

Section 404.1527(e)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." The ALJ therefore properly gave no controlling weight or even "any special significance" to the opinions that Plaintiff could not work.

39

The analysis does not end there, however, because the ALJ was required to evaluate the "medical opinions" on issues not reserved to the Commissioner, pursuant to 20 C.F.R. § 404.1527, which provides, in pertinent part:

(d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship* . Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

40

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.
>
> (3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .
>
> (4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

As already found, all four providers discussed by Plaintiff are examining, not treating physicians. Each apparently evaluated Plaintiff on only one occasion, mostly as part of Plaintiff's workers' compensation claim. The ALJ based his according little weight to these providers on the lack of supportability of the opinions and their inconsistency with the record as a whole. The ALJ found the opinions were not supported by the objective medical evidence; the opinions were based largely on Plaintiff's self-reported, subjective symptoms, which were not credible; and were inconsistent with other persuasive evidence.

The undersigned first finds substantial evidence supports the ALJ's finding that Plaintiff was "not totally credible." SSR 96-7p provides, in pertinent part:

> One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:
>
> > The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.
> >
> > The consistency of the individual's own statements. The adjudicator must

compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

The inconsistencies the ALJ cited in his Decision include: In February 1999, Plaintiff denied any alcohol or drug problems; In April 2000, Dr. Irvin urged him to seek treatment at drug rehab or pain center; In December 2000, Plaintiff's treating physician had concerns regarding Plaintiff's alcohol consumption. Plaintiff refused the offer of inpatient drug and alcohol rehab; On May 9, 2001, Plaintiff denied any misuse of alcohol or drugs to Dr. Baraff; On May 24, 2001, Plaintiff was reportedly in "acute withdrawal" and "admitted [] that he had been using Street Drugs in addition to his prescribed pain treatment;" He agreed to enter inpatient drug rehab; On June 7, 2001, however, he again refused to go to drug rehab; Also in June 2001, Plaintiff admitted drinking

"maybe one beer per week," and taking OxyContin he was "buying on the street;" About that same time he admitted buying "a lot of street drugs;" Also in 2001, Plaintiff told a psychologist to whom he was referred that he had been off alcohol for a period of several years, and did not mention any opiate use; In December 2001, Dr. Irvin was concerned because Plaintiff was drinking alcohol in addition to taking his MS-Contin and Percocet. He was instructed to "drink absolutely no alcohol;" A drug screen at the pain clinic in July 2002, revealed use of illegal drugs. Plaintiff was therefore not permitted to attend; Plaintiff and his wife both presented to the emergency room for chest pain on July 17, 2002. All studies were normal, except that urine tests showed both Plaintiff and his wife had used cocaine, barbiturates, and opiates. Plaintiff denied the illegal drug use, but his wife admitted they had; In October 2002, Plaintiff denied <u>any</u> history of substance abuse to Dr. Payne. He was referred for rehabilitation for cocaine and narcotic abuse; Plaintiff did not report his 3rd DUI offense, claiming to have last been arrested for DUI in 1997; Records from Ohio Valley Medical Center in early 2003, contain references to "history of IV cocaine abuse," and "he has been known to be a narcotic abuser, both IV Cocaine as well as prescription narcotics;" In May 2003, Plaintiff reported to psychologist Moran that he had "a <u>remote</u> history of significant alcohol abuse," and "a <u>remote</u> history of cocaine and marijuana abuse." He denied any current use of alcohol, illicit substances, or misuse of prescription medications; Also in May 2003, Plaintiff reported to another provider that he had not used any alcohol in the past two years, and it was more than two years since he last used any marijuana or cocaine. He denied any misuse of prescription drugs; On August 8, 2003, Plaintiff told the hospital that his treating physician had sent him there for something for pain, but that doctor indicated to the ER physician that Plaintiff should not have narcotic medications; Plaintiff told Dr. Nalluri in November 2003, that he had "<u>no history illicit psychoactive substance</u>

43

abuse (such as cannabis, cocaine, LSD, heroin, etc.) or prescription drug abuse (such as morphine, OxyContin, etc.)" He reported a prior history of alcohol abuse, but said he no longer drank, reported last smoking marijuana two years earlier, and stated he had tried cocaine "once when he was younger;" Despite his own June 2001, report that he was taking OxyContin, and his 2003 report to the ER that he had been on Oxycontin and needed more, Plaintiff testified at the hearing in early 2004, that he had never taken OxyContin; When asked at the hearing if he had ever taken any illegal drugs, he testified he had "tried different stuff" in the last couple years "to see if it help[ed his] pain." He said he had tried cocaine twice and marijuana five times. At the February 2004 hearing, Plaintiff testified he had stopped drinking alcohol two to two-and-a-half years earlier, which would have been between August 2001 and February 2002. He was jailed for DUI in 2003, but testified that was for an old offense.

Plaintiff was also inconsistent regarding his ability to drive. He stated in February 1999, that he drove his wife to dialysis. In June 2001, Plaintiff told his doctor he could not go into inpatient rehab because he needed to drive his wife to dialysis. In October 2002, Plaintiff said he could not drive due to blurred vision, headaches, lack of concentration, and constant fidgeting. It was noted by the doctor, however, that his license was suspended. In January 2003, Plaintiff told Dr. Wiley he could not drive. In May 2003, Plaintiff reported he no longer drove "due to anxiety and physical limitations related to pain." He reported he did not drive at all "because of his inability to maintain control of a car due to his physical limitations and pain." In November 2003, he told Dr. Nalluri he was unable to drive, although the doctor noted his license was suspended. At the hearing in February 2004, Plaintiff testified under oath that he did not drive his wife to her dialysis and never had, because he couldn't sit that long. He also testified he never drove because he lost his license due to

a DUI and never got it back. Psychiatrist Clausell reported in March 2004, however, that Plaintiff reported he was "able to get out of the home and drive on a regular basis and he needs to do this to take his wife to dialysis treatments on a three time per week basis."

Plaintiff also testified at the hearing that he had not done any yard work or weeding "or anything like that" since he got hurt in 1997. Yet in July 2003, only about six months before the hearing, he presented to the ER with cellulitis from being "out in the weeds, cutting them." In November 2000, he presented to the hospital with an infection of the right arm from a puncture wound he got when he was either cutting wood or piling up wood, depending on the report. He also reported at one point working on his engine.

Plaintiff was also inconsistent regarding his military history. Plaintiff reported on some occasions that he was honorably discharged from the National Guard after 18 years, but at other times that he served between 14 and 15 years, and received something other than an honorable discharge due to failure to complete his tour of duty. He denied ever having any problems with the military. When specifically asked about this at the hearing, Plaintiff testified he never received an honorable discharge, and got out of the National Guard because he "just got tired of it." He never finished his time, but he was "not real sure" about his discharge, just that it was not an honorable discharge.

The undersigned finds the ALJ properly considered the inconsistencies in Plaintiff's own reports to his own health care providers in determining that Plaintiff was less than credible regarding his impairments and limitations.

In addition to the inconsistencies in Plaintiff's own reports to his medical providers, the ALJ noted that several of Plaintiff's own treating physicians did not find him entirely credible. Dr. Payne,

whom Plaintiff testified he saw at least three times, and to whom Plaintiff was referred first by his treating physician, noted Plaintiff's sensory findings were nondermatomal and that inconsistencies noted in the course of the examination were indicative of "malingering." He stated:

> The patient's bilateral +3/5 lower limb weakness would have prevented him from not only mounting and dismounting from the examination table but this level of weakness would have prevented him from hopping on his right leg and certainly would have prevented him from squatting. This also suggests the possibility of malingering. There were no impairments of the deep tendon reflexes of the lower limbs in keeping with the profound nature of the motor weakness. This fact reinforces the consideration that malingering was being evidenced.

In June 2001, Plaintiff's treating physician, Dr. Irvin, told Plaintiff to find a new doctor, because Plaintiff had admitted using street drugs, and refused to go to rehab. After Plaintiff told Dr. Irvin he could not go into rehab because he needed to drive his wife to her dialysis appointments,[2] Dr. Irvin apparently relented and took him back as a patient. However, by October 2001, Dr. Irvin reported Plaintiff had still not gone to inpatient or outpatient rehab and again told him to find another doctor. On July 8, 2002, Dr. Irvin reported that Plaintiff had finally gone to the pain clinic, but a screening revealed use of illegal drugs. Dr. Irvin at that time gave Plaintiff 30 days notice to find another doctor, and referred him to several who were taking new patients. Plaintiff or his wife on Plaintiff's behalf continued to call Dr. Irvin for medications, however, until Dr. Irvin finally informed Plaintiff that Plaintiff was harassing him and if he returned, he would call the authorities. Yet when asked at the hearing why he stopped getting medications from Dr. Irvin, Plaintiff testified that Dr. Irvin had moved, and "instead of . . . me goin' clear up here to see Dr. Irvin, I started seein' Dr. Wood again."

For all these reasons, the undersigned finds substantial evidence supports the ALJ's

---

[2]Which excuse is inconsistent with other reports by Plaintiff, as noted above.

determination that Plaintiff was not credible. Because Plaintiff was not credible in his reporting to

his own health care providers, it follows that these providers' opinions are also not entirely credible.

See Lilly v. Director, Office of Workers' Compensation Programs, 989 F.2d 493 (4th Cir. 1993)

(unpublished). In Lilly, a workers' compensation case, the Fourth Circuit found: "The ALJ could

properly find the credibility of these physicians' etiology findings undercut by their lack of accurate

information regarding Lilly's work and smoking history." Likewise, in the present case, the

physicians,' in particular the psychologists' and psychiatrists,' lack of information regarding

Plaintiff's illegal drug use, alcohol use, and prescription drug misuse undercuts their findings

regarding Plaintiff's ability to work– for instance, his concentration, persistence, and pace.

Finally, the ALJ found inconsistencies between different providers' opinions. As the Fourth

Circuit stated in Hays v. Sullivan, 907 F.2d 1453 (4th Cir. 1990):

> Ultimately, it is the duty of the administrative law judge reviewing a case, and not the
> responsibility of the courts, to make findings of fact and to resolve conflicts in the
> evidence. King v. Califano, 599 F.2d 597, 599 (4th Cir.1979) ("This Court does not
> find facts or try the case *de novo* when reviewing disability determinations.");
> Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir.1976) ("We note that it is
> the responsibility of the Secretary and not the courts to reconcile inconsistencies in
> the medical evidence, and that it is the claimant who bears the risk of
> nonpersuasion."); Blalock v. Richardson, 483 F.2d at 775 ("[T]he language of §
> 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the
> Secretary's decision even should the court disagree with such decision as long as it
> is supported by 'substantial evidence.' ").

The ALJ found Dr. Payne, a neurosurgeon whom Plaintiff states he saw three times, more

credible regarding Plaintiff's physical impairments and limitations than he did the other physicians.

The ALJ also found psychiatrist Clausell's opinion more credible than that of the other mental health

providers. Dr. Clausell examined Plaintiff twice, twice finding that Plaintiff could probably still

work and was "not disabled due to his psychiatric disorder," despite the fact that Plaintiff told him

he had not used any alcohol since 2001; had not used any cocaine or marijuana since 2001; denied

any misuse of prescription drugs; had only one DUI, in 1997; served 18 years in the National Guard,

receiving an honorable discharge; and could not drive at all because of his inability to maintain

control of a car due to his physical limitations and pain, all of which statements are contradicted by

other evidence in the record. Even with all these apparently incredible statements, Dr. Clausell

diagnosed Plaintiff with Major Depressive Disorder, Single, Moderate; and Traumatic Stress

Disorder, Chronic, Stable. He assessed his GAF as 60[3] and found him in partial remission regarding

his depression. He found him not disabled due to psychiatric disorders. He found Plaintiff's overall

psychiatric impairment fell in the <u>mild</u> range and that the impairment was <u>not expected to be</u>

<u>progressive</u>. The psychiatric condition itself did not permanently preclude gainful employment, <u>even</u>

<u>in Plaintiff's old job</u>.

Although one year later, Dr. Clausell downgraded Plaintiff's diagnosis to Pain Disorder

Associated with Both Psychological Factors and a General Medical Condition, and also lowered his

GAF to 55 (still moderate), the Doctor himself stated he did so "because of the general worsening

of his chronic pain, and as well as, psychological condition, his apparently inadequate medical

treatment for his chronic pain, and as well, inadequate treatment for his depression and anxiety."

He believed Plaintiff, who had informed him that his family doctor was not supportive of medication

treatment for his psychiatric dysfunction, when he said he was "hoping to be referred to a

psychiatrist," and that he was "awaiting evaluation by a pain management specialist." He told Dr.

---

[3] GAF of 60 is at the very top of the range that indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("<u>DSM-IV</u>"), 32 (4th ed. 1994). (Emphasis in original).

48

Clausell his doctor, Norman Wood, was "trying to take him off his medications, telling [him] that he does not need them." Dr. Clausell believed Plaintiff when he told him that Dr. Wood " will not prescribe the patient pain medications because he does not believe in them. He apparently has referred the patient to see a Dr. Sakla for a pain management evaluation on April 1, 2004. The claimant reports that he is looking forward to this because he needs some relief."

As the ALJ noted, Plaintiff had been referred numerous times to the pain clinic by different providers. He refused to go for several years, at some times reporting he needed to drive his wife to her dialysis treatments, and at others reporting he could not drive at all due to his impairments. When he finally relented and went to the pain clinic he was rejected because of his use of illegal drugs. Further, at the hearing only about one month earlier, Plaintiff testified that Dr. Wood was trying to wean him off the medications because he thought Plaintiff was addicted to them, but that Dr. Woods had said that if that didn't work he would put him back on the medications.

The ALJ also properly considered the opinions of the Agency reviewing physician and psychologists. The regulations clarify that ALJs "are responsible for reviewing the evidence and making findings of fact and conclusion of law." 20 C.F.R. § 416.927(f)(2). 20 CFR § 404.1527(f)(2)(i) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

Dr. Lauderman considered Plaintiff's physical functional ability and opined that he retained the ability for light work with only occasional postural movements. Psychologists Kuzniar and

Roman opined that Plaintiff's mental impairments of affective and anxiety disorders imposed no more than mild limitations in activities of daily living, social functioning, and concentration persistence or pace. The undersigned finds substantial evidence supports the ALJ's according the State agency expert opinions substantial weight.

Finally, despite having found Plaintiff not credible, and despite having found much of his doctors' reports incredible due to being based on Plaintiff's subjective accounts, the undersigned notes the ALJ credited Plaintiff's accounts of pain and limitation to the extent that he limited him to a great degree. The ALJ's RFC is as follows:

> [T]he undersigned finds the claimant has retained the residual functional capacity for light work with the ability to briefly (for one to two minutes) change positions at least every 1/2 hours; with no flexion or extension of the neck more than 5 degrees up or down; with no rotation of the head or neck more than 15 degrees in either direction, right or left; with no work with the general public; with no close interaction with the coworkers or supervisors; with no fast paced or assembly line work; with no more than rare changes in the work setting; with no close concentration or attention to detail for extended periods; with no requirement to set his own workplace goals more than rarely; with no driving or travel required as part of the job; and with an allowance for being able to miss up to one day of work per month, on average.

(R. 45). In response to the RFC as stated in the hypothetical, the Vocational Expert testified there would be a significant number of jobs available for Plaintiff in the local and national economy.

For all the above reasons, the undersigned United States Magistrate Judge finds substantial evidence supports the ALJ's determination that Plaintiff was not under a disability, as defined in the Social Security Act, as of his date last insured or at any time through the date of his decision.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** the Plaintiff's Motion for Summary

Defendant's Motion for Summary Judgment be **GRANTED**, the Plaintiff's Motion for Summary Judgment be **DENIED**, and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _27_ day of _November_, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE